IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION


JASNA KUHAR,                                    )
                                                )
          Plaintiff                             )
                                                )
     v.                                         )          No. 1:15-cv-1533 (LMB/MSN)
                                                )
DEVICOR PRODUCTS, INC., and                     )
JOSEPH BAIA                                     )
                                                )
          Defendants.

### MEMORANDUM OPINION

On September 23, 2016, the Court issued an order granting defendants' Motion for

Summary Judgment [Dkt. 43] and the Clerk of the Court entered judgment in favor of the

defendants [Dkt. 44]. This memorandum opinion supplements the reasoning set forth in open

court.

### I.     BACKGROUND

Plaintiff Jasna Kuhar filed this civil action on November 17, 2015, alleging age

discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621

("ADEA"), and sex discrimination in violation of Title VII of the Civil Rights Act of 1994, 42

U.S.C. § 20003 ("Title VII"), against her former employer, Devicor Products, Inc. ("Devicor");

and, defamation under Virginia common law against Devicor and Joseph Baia ("Baia"), her

former supervisor. [Dkt. 1].

Plaintiff is a 54-year-old female who began her employment with Devicor in November

2011 as a sales representative for Devicor's Mammotome Breast Biopsy System. [Dkt. 1] ¶¶ 5-6;

Kuhar Dep., [Dkt. 36-1] Ex. 5. As a sales representative, plaintiff was responsible for increasing sales of Mammotome products by establishing new accounts, increasing utilization within existing accounts, and ensuring clinical and customer satisfaction. Garlock Dep., [Dkt. 36-3] at 19:21-20:4. Mammotome products included breast biopsy machines—"capital" equipment—and related "disposable" products necessary for each procedure (i.e., probes and tissue markers utilized in conjunction with the machine). [Dkt. 1] ¶¶ 7, 10; Def. Uncontested Facts ¶ 3. Disposables comprised the majority of Devicor's sales. Def. Uncontested Facts ¶ 3.

Each of Devicor's sales representatives was assigned an annual sales quota, a figure determined by the corporate office based on a combination of the prior year's sales in a territory and the growth amount that Devicor expected in the coming year. Def. Uncontested Facts ¶ 7. The degree of expected growth was applied evenly to all territories. Id. Plaintiff admitted that meeting these annual quotas was "very important" for sales representatives. Kuhar Dep., [Dkt. 36-1] at 62:4.

Upon joining Devicor, plaintiff was assigned to the Washington, D.C. territory, with which she was familiar based on her work from 1997 to 2003 with Ethicon Endo, the company from which Devicor acquired the Mammotome product line in 2010. [Dkt. 1] ¶¶ 6-7; Kuhar Dep., [Dkt. 36-1] at 74:3-6. Devicor's D.C. territory was without a sales representative for part of 2011, during which time Devicor lost several accounts. Downs Dep., [Dkt. 40-3] at 45:14-46:3. Upon her arrival in November 2011, plaintiff "quickly developed relationships and secured accounts that were at risk." Kuhar Dep., [Dkt. 36-1] Ex. 8.

It is undisputed that in 2012, plaintiff's first full year on the job, she failed to meet her sales quota, achieving only 94% of her target. Def. Uncontested Facts ¶ 11. Mary Downs, plaintiff's direct supervisor as of February of that year, wrote in plaintiff's 2012 performance

2

evaluation that plaintiff was "below" expectations in the "Sales v. Quota" category of

performance. Kuhar Dep., [Dkt. 36-1] Ex. 8. Although plaintiff achieved 125% of her capital

quota for 2012, disposables sales declined substantially from 2011—down 28% in markers and

14% in probes—causing her to finish below her annual quota. Id. Downs also commented in the

2012 performance evaluation that some of this erosion was due to external factors, including

"accounts that were lost while the Territory was [without a sales representative] in 2011," id.,

and product defects, id. Specifically, kinked tubing in one of the biopsy machines posed a

challenge to both customers and sales representatives. Downs Dep., [Dkt. 40-3] at 16:14-17:6;

Kuhar Dep., [Dkt. 36-1] at 127:17-32:18. The evaluation also pointed out specific deficiencies in

plaintiff's performance: although plaintiff's territory was "one of the largest . . . in the country,"

her sales of Elite—Devicor's newly launched Mammotome product line—were "slow," placing

her 52nd out of 59 sales representatives. Kuhar Dep., [Dkt. 36-1] Ex. 8.[1]

In 2013, Downs conducted two in-person assessments of plaintiff's performance. During

these Field Visits, regional sales managers spend multiple days in the territory visiting clients

and reviewing sales, accounts, and opportunities with the sales representative. Def. Uncontested

Facts ¶ 17. After visiting plaintiff in November and December 2013, Downs issued a Field Visit

Letter[2] describing plaintiff as "not meeting" her performance objectives and advising her to

---

[1] Plaintiff argues that part of the reason she failed to meet her sales quota in 2012 was because the Elite product line was not working properly, Pl. Opp. at 5; however, plaintiff acknowledges that, since all Devicor sales representatives sell the same products, they were equally affected by mechanical or production problems with the product lines. Def. Uncontested Facts ¶ 14.

[2] A Field Visit Letter is effectively a mid-year performance evaluation. It consists of a form with year-to-date sales quota data, a grid for numerically assessing sales representatives' performance on a set of sales competencies, as well as a space for qualitative feedback. See, e.g., Kuhar Dep., [Dkt. 36-1] Ex. 9. The numerical rating system ranges from one to four: 1=Needs Development; 2=Skilled; 3=Strength; and 4= Role Model. Id.

"close competitive business" and improve completion of administrative responsibilities. Kuhar Dep., [Dkt. 36-1] at 144:6-145:20; id. Ex. 9. The letter cautioned that, although plaintiff was excelling in capital sales, "this may have caused [her] to sacrifice [her] Elite business." Kuhar Dep., [Dkt. 36-1] Ex. 9. At the time, plaintiff was only reaching 53% of her Elite quota, which placed her 45th among sales representatives. Id. Downs observed that "[plaintiff] must improve this performance if [she is] going to achieve success in 2014." Id.

For 2013, plaintiff only achieved 96% of her sales quota. Def. Uncontested Facts ¶ 16. As a result, she again received a "below" expectations mark on her annual performance evaluation. Id. ¶ 19. In that evaluation, Downs commented that plaintiff "faced several losses during [the] year," including a major competitor threat at Washington Radiology Associates (WRA), Kuhar Dep., [Dkt. 36-1] Ex. 10, her largest account (worth $500,000, see Kuhar Dep., [Dkt. 36-1] Ex. 9). Plaintiff ultimately saved the WRA account but had to offer steep discounts, which impacted her total sales. Id. Although Downs recognized that plaintiff confronted a number of challenges, including competitive threats, the loss of a Kaiser account, price erosion, and product issues, she described plaintiff's quota performance as "disappointing." Id. Notwithstanding this criticism, Downs praised plaintiff for her dedication to her customers, business acumen, mentorship role among new sales representatives, and for helping to cover the open Baltimore territory. Id.

The following year, Downs conducted three Field Visits with plaintiff, in February, April, and August 2014. Kuhar Dep., [Dkt. 36-1] Exs. 11-13. At the time of each of these visits, plaintiff was performing well-below her quota, with year-to-date sales of 83%, 80%, and 80%, respectively. Id.

In a letter written after the February Field Visit, Downs suggested that plaintiff's close relationships with her clients "ma[d]e it difficult for [her] to have the challenging conversations

with the customers." Kuhar Dep., [Dkt. 36-1] Ex. 11. Downs also gave plaintiff a rating of "1"—
i.e., "Needs Development"—in the "Administrative" category, which assesses whether a
representative "completes administrative responsibilities in an accurate and timely manner." Id.
Downs recommended that plaintiff set aside more time for "Panorama, Sales Force, and
Territory Management discussions," software platforms that Devicor used to track daily sales,
market trends, and emerging threats and opportunities in individual territories. Id. In keeping
with these criticisms, the letter instructed plaintiff to focus on improving her competitive selling
and administrative performance. Id.

Plaintiff received another "1" in the "Administrative" category in Down's letter
following her April Field Visit. Kuhar Dep., [Dkt. 36-1] Ex. 12. Downs again reminded plaintiff
to use Sales Force and Panorama to monitor her day-to-day sales performance and analyze
territory trends and reiterated that plaintiff needed to focus on "competitive selling," particularly
identifying new competitive targets. Id.

After the August Field Visit, Downs gave plaintiff her third successive "1" for
"Administrative" performance, and downgraded her "Competitive Selling" mark from "2"—i.e.,
"Skilled"—to "1"—"Needs Improvement." Kuhar Dep., [Dkt. 36-1] Ex. 13. Downs again
emphasized that plaintiff's customer-focused style was both an asset and a liability. Although the
letter recognized that plaintiff "spen[t] a great deal of time providing customer service to existing
accounts," it also cautioned plaintiff that she "must strategize and manage [her] time to insure
[sic] that [she is] spending more time investing in competitive opportunities. Only these
competitive opportunities will yield . . . the growth [plaintiff] need[s] to close the gap." Id.
Plaintiff admits that at the time of Downs' last field visit, she was "having a lot of erosions" and
had "lost two big accounts" to competitors. Kuhar Dep., [Dkt. 36-1] at 165:14-66:8.

Downs' August letter also commented that the WRA account had become a "complete distraction" due to competitive threats across various product lines. Kuhar Dep., [Dkt. 36-1] Ex. 13. Plaintiff had set up a series of free product evaluations at WRA, and the account, which brought in $490,000 in 2012 and $248,673 in 2013, had generated just $86,584 as of August 2014. Id. To save the WRA account, plaintiff recommended a "dramatic discount" worth $180,000 that needed high level approval. Downs Dep., [Dkt. 40-3] at 27:7-15; [Dkt. 1] ¶ 18. Downs concluded that, once the latest evaluation was completed at the end of the month, Devicor needed to initiate "aggressive negotiation across [its] complete product line." Kuhar Dep., [Dkt. 36-1] Ex. 13. Downs closed the letter by stating, "Significant and sustainable improvement in your performance and improved business results is imperative." Id. When Downs met with plaintiff to discuss the Field Visit Letter, Downs mentioned that a formal performance improvement process would be put in place if plaintiff did not start increasing her sales. Kuhar Dep., [Dkt. 36-1] at 164:21-65:13.

In late 2014, Devicor restructured its sales regions to reduce the ratio between regional sales managers and their sales representatives. Def. Uncontested Facts ¶ 24. Following the restructuring, Downs was assigned to a different region and Joseph Baia, a 43-year-old male, became plaintiff's new manager. Def. Uncontested Facts ¶ 25. Before moving to her new territory, Downs notified Devicor's human resources director, Dana Bryan, that she was concerned about plaintiff's performance and wanted to put her on a Performance Improvement Plan. Bryan Dep., [Dkt. 36-6] at 25:1-19.[3] Bryan recommended that Downs hold off to let the

---

[3] Downs does not recall reaching out to HR to put plaintiff on a Performance Improvement Plan. Downs Dep., [Dkt. 40-3] at 50:16-18.

new manager begin working with plaintiff before initiating a formal Performance Improvement Plan. Id.

Baia began supervising plaintiff in September 2014. Def. Uncontested Facts ¶ 31. At their initial meeting, Baia emphasized the importance of plaintiff making her annual sales quota. Id. That same month, Baia placed plaintiff on a Performance Improvement Plan. Id. ¶ 42. As part of this process, Baia asked plaintiff to put together a development plan outlining performance objectives for the remainder of the year. Id. ¶ 41. They both worked together to prepare the final document, but plaintiff identified the accounts for which she planned to close deals. Id. Copies of the plan were sent to both Bryan and Mark Parisi, Baia's supervisor and Devicor's National Director of Sales. Id. ¶ 42.

One of plaintiff's stated performance objectives in 2014 was to close an account on a new product line with WRA, her largest customer. Baia understood the strategic significance of this relationship, and in September 2014 he asked plaintiff to arrange a dinner for the two of them and Patrick Waring, the Chief Financial Officer (CFO) of WRA. Kuhar Dep., [Dkt. 36-1] at 169:8-20. Although plaintiff had told Waring that the dinner was just to meet her new manager, during the meal Baia asked a number business questions, at which point Waring insisted that he was not the decision-maker for the account. Kuhar Dep., [Dkt. 40-2] at 173:6-13. Later that week, Waring called Devicor and asked for a same-day price quote for the Revolve product line. Baia offered WRA a discounted price, but not as steep a discount as plaintiff had recommended. Def. Uncontested Facts ¶ 36. WRA ultimately rejected the Revolve line and signed with a competitor. Id. ¶ 37.

Baia conducted his first official Field Visit to plaintiff's territory in mid-October. In his ensuing letter, he identified several problems with her performance. Although Baia gave plaintiff

"2's" in the Competitive Selling and Administrative categories, he gave her a "1" for "Territory

Management." Kuhar Dep., [Dkt. 36-1] Ex. 19. During 2014, plaintiff's territory, which had

previously included Washington, D.C., Fredericksburg, and part of southern Maryland, was

expanded to include Richmond. She also continued to cover the open Baltimore territory for part

of the year. Kuhar Dep., [Dkt. 36-1] at 74:3-11; id. Ex. 13. Baia's letter observed that plaintiff

"[had] a large territory that requires better efficiencies to maximize all [her] opportunities."

Kuhar Dep., [Dkt. 36-1] Ex. 19. He emphasized that her "positive relationships need to be

leveraged for business and execution of [her] business plan." Id. When assessing the phases of

her sales process, he gave her a "1" for the "Close" phase,[4] explaining that opportunities "mean

nothing if [plaintiff] [could not] close the business and have the customer order/start using the

product without [plaintiff] being there." Id. He added that, although she had the skills to be

successful, she needed to "focus on being more assertive." Id. "Prove to me and leadership,"

wrote Baia, that "you have a process that can achieve repeatable positive results these next two

months." Id.

   Midway through the performance improvement period, Baia met with Bryan to discuss

plaintiff's progress. Bryan Dep., [Dkt. 36-6] at 33:1-16. Baia concluded that there was not

enough business in plaintiff's pipeline to enable her to achieve her performance goals. Id. at

33:18-34:2. After verifying with Parisi and Brian Garlock, Devicor's Sales Operations Manager,

Bryan agreed with Baia that there was not enough in plaintiff's pipeline to even get her "moving

in the right direction towards her goal." Id. At the end of November, Baia, Parisi and Garlock

decided to terminate plaintiff. Baia Dep., [Dkt. 36-4] at 128:17-29:21. Parisi advised Baia to act

---

[4] Devicor used a six-phase sales process: Approach, Interview, Demonstrate, Validate, Negotiate, and Close. Downs Dep., [Dkt. 36-5] at 41:12-17.

immediately, but Baia requested that they retain plaintiff through the new year and leadership agreed. Id. at 129:6-13. In his email to Bryan detailing the reasons for plaintiff's termination, Baia emphasized that plaintiff had missed her sales quota for three consecutive years and had failed to close accounts in accordance with plaintiff's September 2014 development plan. Email from Baia to Bryan on Jan. 6, 2015, [Dkt. 36-7] at DEF 000430. He also wrote that she was "clinically sound and relationship oriented. However, she is challenged with the process of closing business as evident by her sales history. Furthermore, I have lost confidence in her ability to cultivate, investigate and close enough business for her to make the annual quota required for the DC territory." Id. At his deposition, Garlock confirmed that plaintiff was terminated for "consistently being below her quota" and "not meeting the development objectives that could have closed her gap." Garlock Dep., [Dkt. 36-3] at 97:10-21.

As Baia and Bryan predicted, plaintiff failed to meet her sales quota for 2014, achieving just 91% of her assigned quota of $1,334,625, a $114,494 shortfall, Sales Force 2014 Scorecard (Jan.-Dec.), [Dkt. 36-7] at DEF 000272, despite a company-wide sales quota reduction that management initiated in mid-2014 to "provide a realistic quota and expectation of incremental growth over the prior six-month period." Garlock Dep., [Dkt. 40-1] at 48:20-49:8. Under that reduction, plaintiff's quota for the second half of the year was reduced by $42,213. Email from Baia to Bryan on Jan. 6, 2015, [Dkt. 36-7] at DEF 000430. (With this adjustment, she attained 97% of the quota for the second half of the year. Id.) She also failed to meet the objectives set forth in the development plan by not closing the 12 accounts that she identified. Def. Uncontested Facts ¶ 49.[5]

---

[5] There is an inconsistency in the record as to how many accounts plaintiff closed in 2014. Although the parties agreed in the Statement of Uncontested Facts that plaintiff closed six of the

Following the November decision to terminate plaintiff, Baia began a soft search for her replacement. Beginning in December, Baia reviewed approximately twenty resumes and interviewed six to eight candidates. Baia Dep., [Dkt. 36-4] at 165:18-21. The two final candidates were both men. Id. at 167:20-22. Of the two, Baia preferred Rich Jenkins, a 34-year-old male. Id. at 168:13-14. Jenkins had a business-to-business sales background and medical device experience. He was also from the D.C. area. Def. Uncontested Facts ¶ 62. Baia believed that Jenkins presented well in the interview and all of the individuals who interviewed Jenkins recommended hiring him. Id. ¶ 64. On January 14, 2015, Devicor offered him the position of sales representative for the D.C. territory. Jenkins Offer of Employment [Dkt. 36-7] at DEF 000204.

Plaintiff was not told she was being terminated until January 13, 2015 when Baia met her for dinner. Def. Uncontested Facts ¶ 52. At the dinner, Baia offered plaintiff the option of working for a one-month transition period—until February 13, 2015—and she agreed. Id. at ¶ 53. The following week, Baia asked plaintiff to introduce her customers to her replacement but she refused. Kuhar Dep., [Dkt. 36-1] at 227:14-19. Around this time, plaintiff also decided that she no longer wanted to participate in a transition period. Kuhar Dep., [Dkt. 40-2] at 101:14-102:06. Bryan convinced plaintiff to work through the end of January, to update Sales Force, and take client calls, but said that she did not have to introduce her replacement or deal with Baia. Id. at 232:1-19. Plaintiff told Bryan that she did not want to do any evaluations or assist with any mammogram procedures after January 23. Id. at 233:90-20. Plaintiff did not tell any of her

---

12 accounts, supra, Baia's email to Bryan setting forth the reasons for plaintiff's termination claims that she only closed one of the accounts. Email from Baia to Bryan on Jan. 6, 2015, [Dkt. 36-7] at DEF 000430. Irrespective of how many accounts she closed and when, plaintiff acknowledges that even if she had closed all of the accounts identified in her development plan, she would not have met her 2014 quota. Kuhar Dep., [Dkt. 36-1] at 205:2-7.

customers that she was leaving Devicor. Id. at 101:14-17. Because plaintiff was unwilling to complete the transition, her last day of employment was February 6, 2014, one week earlier than the February 13, 2015 date she and Baia initially agreed upon. Kuhar Dep., [Dkt. 36-1] at 234:22-35:6.

Baia took Jenkins to meet the WRA client team in the first week of February. Def. Uncontested Facts ¶ 66. When Baia introduced Jenkins to Denise Jacques, a Senior Mammography Technician, and Merry Dee McFarlin, the Chief Technologist, Jacques asked where the plaintiff was. Jacques Dep., [Dkt. 36-9] at 23:1-16. Baia responded by saying that plaintiff had "up and left," Def. Uncontested Facts ¶ 67, 70, adding that plaintiff had issues relating to her niece being "depressed" and "off her meds," Def. Uncontested Facts ¶ 70. Baia also told Jacques that plaintiff was "not a closer." Def. Uncontested Facts ¶ 75. When Jacques reached out to plaintiff to confirm Baia's explanation, plaintiff acknowledged that her "niece [was] not doing well" and was in a "state of depression." Def. Uncontested Facts ¶ 73. After Baia's conversation with Jacques and McFarlin, WRA complained to Devicor about having Baia as their regional sales manager and Downs was reassigned as the manager for that account. Garlock Dep., [Dkt. 40-1] at 69:4-14. Jacques and McFarlin testified that they maintain a very high opinion of plaintiff's professionalism, Jacques Dep., [Dkt. 36-9] at 13:8-20; McFarlin Dep., [Dkt. 36-10] at 12:7-15, and Waring, the WRA CFO, reached out to her about a position with another medical device company, Kuhar Dep., [Dkt. 36-1] at 277:11-14.

## II.    DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than just "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotations omitted); see also Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010). The failure to do so "renders all other facts immaterial" and entitles the movant to summary judgment as a matter of law. Rhodes, 636 F.3d at 94. The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable

probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

B. Analysis

1. Counts I and II: Age and Sex Discrimination

For plaintiff's ADEA and Title VII claims to survive defendants' motion for summary judgment, she must rely either on direct evidence that age and/or sex discrimination motivated Devicor's decision to terminate her employment or prove her case indirectly. See, e.g., Freeman v. North State Bank, 282 F. App'x 211 (4th Cir. 2008). Because there is no direct evidence of age or sex discrimination, and plaintiff makes no attempt to argue that there is, plaintiff must proceed by the indirect method. That method requires that a plaintiff establish a prima facie case by providing evidence that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations; and (4) similarly situated employees received more favorable treatment. Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). Because both age discrimination under the ADEA and sex discrimination under Title VII are assessed using this same test, this opinion analyzes Counts I and II together.

If plaintiff can make a prima facie showing of discrimination, the burden shifts to Devicor to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). If Devicor articulates such a reason, plaintiff must then prove by preponderance of the evidence that Devicor's stated reason is, in fact, merely a pretense for discrimination. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-42 (2000)).

There is no dispute that plaintiff has satisfied the first two prongs of the prima facie case: plaintiff is a woman and was 53-years old when Devicor subjected her to the adverse employment action of termination. Pl. Opp. at 16. But, as the uncontested evidence shows, plaintiff fails to satisfy the third element of satisfactory job performance because she offers no evidence that she was performing her job duties to her employer's satisfaction. To the contrary, Devicor has submitted extensive evidence to support its claim that plaintiff was not performing to its satisfaction, as evidenced by her failure to meet her sales quotas in 2012, 2013, and 2014. In 2012, her first full year on the job, plaintiff's sales of disposable products declined—down from 2011, the year when the territory was without a sales representative for several months— and she was ranked 52 out of 59 representatives on sales of the Elite product line. Kuhar Dep., [Dkt. 36-1] Ex. 8. In 2013, plaintiff was warned that her capital sales could be detracting from her disposables business—the mainstay of Devicor's revenue stream. Kuhar Dep., [Dkt. 36-1] Ex. 9. All four of the Field Visit Letters that plaintiff received from Downs between December 2013 and August 2014 advised her to improve her competitive sales and more faithfully complete her administrative responsibilities. Kuhar Dep., [Dkt. 36-1] Exs. 9, 11-13. And, although Downs praised plaintiff's customer service strengths, she cautioned plaintiff that this was potentially undermining her sales performance, both by making it difficult for her to have challenging conversations with customers and by cannibalizing time that might be better spent driving sales. Kuhar Dep., [Dkt. 36-1] Exs. 11, 13. Baia, who began supervising plaintiff during the last four months of her employment, continued to echo Downs' critiques. Kuhar Dep., [Dkt. 36-1] Ex. 19. When he brought plaintiff's three-year sales performance to the attention of his supervisors, they made the collective decision to terminate plaintiff's employment. Baia Dep., [Dkt. 36-4] at 128:17-29:21. This decision was consistent with Devicor's policy of terminating

employees who failed to reach their annual sales quota for three successive years. Bryan Dep., [Dkt. 36-6] at 28:1-5.

Importantly, although plaintiff makes much of Baia's role in her termination, the performance problems that served as a basis for Devicor's decision to terminate plaintiff were not unique to Baia's brief tenure as her supervisor. Plaintiff had failed to meet her sales quota for the two and a half years preceding the management restructuring while she reported to Downs. Downs' annual performance evaluations and Field Visit Letters consistently critiqued plaintiff's competitive selling. Kuhar Dep., [Dkt. 36-1] Exs. 8-13. The August 2014 letter instructed that improvement was imperative and plaintiff admits that after their final Field Visit together, Downs warned plaintiff that she might soon be put on a Performance Improvement Plan. Id. Ex. 13; id. at 164:18-65:8.[6]

Although plaintiff contends that she "failed to meet her sales quota, in part, because of Baia's unprofessional behavior in the presence of her customers," this allegation is both inaccurate and immaterial. [Dkt. 1] ¶¶ 41, 52. Specifically, plaintiff claims that Baia was the reason Devicor lost a $107,000 sale to WRA. [Dkt. 1] ¶ 25. In fact, what the complaint characterizes as unprofessional conduct was, according to plaintiff in her deposition, merely aggressive negotiations. Kuhar Dep., [Dkt. 36-1] at 169:8-72:22; Kuhar Dep., [Dkt. 40-2] at 173:1-13. WRA had enjoyed a number of free evaluation periods with Devicor and, shortly before transferring to a different region, it was Downs who advised taking an "aggressive" approach with WRA. Kuhar Dep., [Dkt. 36-1] Ex. 13. Baia did just that and there is no basis for

---

[6] Bryan testified that Downs actually initiated this process. Bryan Dep., [Dkt. 36-6] at 25:1-19. Although Downs claims she never initiated the process, Downs Dep., [Dkt. 40-3] at 50:16-18, this distinction is immaterial because plaintiff concedes that she knew that a Performance Improvement Plan was on the horizon before Baia became her manager. Kuhar Dep., [Dkt. 36-1] at 164:21-65:13.

plaintiff's claim that Baia sabotaged her sales performance with WRA. Further, Baia's interaction with WRA is immaterial because, even if the WRA sale had closed, plaintiff acknowledges that this would only have reduced her $114,494 shortfall in 2014 by $35,667. Def. Uncontested Facts ¶ 38.

Plaintiff does not dispute that she failed to meet her annual sales quotas for 2012, 2013, and 2014, and she acknowledges that meeting sales quotas was an "important" requirement of her employment. Kuhar Dep., [Dkt. 36-1] at 62:4. Although she makes much of the things she did well—customer service, capital sales, proficiency with the product lines, Pl. Opp. at 17—she offers no evidence that from Devicor's point of view she was fulfilling her employer's legitimate expectations. See King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (quoting Evans, 80 F.3d at 960–61)).

Plaintiff also fails to satisfy the fourth element of the prima facie case by failing to provide any evidence that other, similarly situated individuals who were not members of her protected class received more favorable treatment. Coleman, 626 F.3d at 190. To be similarly situated, it must be shown that "the employee dealt with the same supervisor, [was] subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Miiadge v. OTO Dev., L.L.C., No. 1:14-CV-00194, 2014 WL 4929508, at *6 (E.D. Va. Oct. 1, 2014), aff'd, 610 F. App'x 242 (4th Cir. 2015) (citing Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010)). Plaintiff's primary contention is that there were other sales representatives who failed to satisfy their sales quota. Pl. Opp. at 17-18. It is true that in any one year a significant percentage of salespersons missed their quotas. (Garlock testified that in 2013 35-40% of

territories met their quota; that number was approximately 40% in 2014 and almost 60% in 2015, Garlock Dep., [Dkt. 40-1] at 25:20-26:16.)[7] But, Devicor does not contend that plaintiff was terminated for simply failing to meet her sales quota in a single year. Instead, it explained that plaintiff was terminated for failing to meet her sales quota for three successive years, Email from Baia to Bryan on Jan. 6, 2015, [Dkt. 36-7] at DEF 000430, and plaintiff fails to identify any other employee, whether a non-member or member of her class, who failed to meet their sales quotas for three consecutive years and was not terminated. In her deposition, plaintiff claimed that Mark Matthews was not terminated despite failing to meet his quota for three years. Kuhar Dep., [Dkt. 40-2] at 211:5-12:3. This is claim is not supported by the record: although Matthews failed to make his sales quota in his first two years at Devicor, in his third year—2013—he achieved 115% of annual sales and earned "President's Club" status, indicating that his performance was in the top 10% of sales representatives. Garlock Decl., [Dkt. 41-2]. As a result, he was not similarly situated to plaintiff.

   Unable to identify an employee who was not terminated despite missing their sales quota for three successive years, plaintiff argues that Baia singled her out for scrutiny while downplaying the performance problems of Brett Hickman, a younger, male colleague. Pl. Opp. at 18. Hickman and plaintiff were not similarly situated either. Hickman made his sales quota in his first year of employment and outperformed plaintiff in 2013. Baia Dep., [Dkt. 36-4] at 130:7-21; Kuhar Dep., [Dkt. 36-1] Ex. 17. In mid-2014, Hickman's year-to-date sales were at 109%. Sales Force 2014 Scorecard (Jan.-Sept.), [Dkt. 36-7] at DEF 000595; Sales Force 2014 Scorecard

---

[7] Contrary to the contention in plaintiff's Opposition, Garlock did not say that 50 to 60 sales representatives missed their quotas. Pl. Opp. at 15. He said that without looking at multiple years of performance data for 50 to 60 representatives, he could not know how many other employees missed quotas during plaintiff's tenure at Devicor. Garlock Dep., [Dkt. 40-1] at 61:11-20.

(Jan.-June), [Dkt. 36-1] at DEF 000591-592. Plaintiff, by contrast, was at 82%. Id. Although

both Hickman and plaintiff would ultimately fall short of their annual quota for 2014, Hickman

attained 96%, while plaintiff achieved just 91%. Sales Force 2015 Scorecard (FY 2015), [Dkt.

36-1] at DEF 000268. And, unlike plaintiff, Hickman had taken a two month leave of absence in

2014. Def. Uncontested Facts ¶ 83; Turchick Decl., [Dkt. 36-2] ¶ 6. In light of Hickman's

superior performance, both on a multi-year time scale and in 2014, he is not similarly situated.

DiQuollo v. Prosperity Mortgage Corp., 984 F. Supp. 2d 563, 572 (E.D. Va. 2013) (holding that

a female loan officer could not claim that a male colleague whose performance metrics were

higher than her own in the year of the adverse event was similarly situated).

      Notwithstanding these differences in their situations, Baia put both Hickman and plaintiff

on Performance Improvement Plans. Bryan Dep., [Dkt. 36-6] at 42:2-8. The major difference in

their treatment was the amount of time that Baia spent in their respective territories: Baia spent

the standard amount of time required of a regional sales manager with Hickman, while spending

double that amount of time with plaintiff. Baia Dep., [Dkt. 40-5] at 140:9-16. But, plaintiff

provides no support for her contention that this disparity was discriminatory, thereby failing to

show that underperforming, younger, male sales representatives were treated more favorably

than plaintiff.

      Although plaintiff cannot establish the fourth element under the similarly situated

standard, in age discrimination cases, courts have sometimes evaluated this element by asking

whether the plaintiff "was replaced by a substantially younger individual." Arthur v. Pet Dairy,

593 F. App'x 211, 217 (4th Cir. 2015) (citing Hill, 354 F.3d at 285). Under this standard,

plaintiff can satisfy the fourth element for her age discrimination claim, as Devicor replaced

plaintiff with Jenkins, a 34-year-old male, Pl. Opp. at 18; however, establishing the fourth

element it is not enough to save plaintiff's prima facie case for age discrimination because, as discussed above, plaintiff still fails to establish the third element.

Finally, assuming that plaintiff had established a prima facie case of unlawful discrimination, Devicor has articulated a legitimate, non-discriminatory reason for placing her on a Performance Improvement Plan and terminating her employment—poor sales performance for three consecutive years. Plaintiff makes no argument and provides no evidence that Devicor's articulated reasons are false and that discrimination was in fact the reason for the adverse employment action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.") (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)) (emphasis in original). Even when viewed in the light most favorable to plaintiff, the evidence in this record does not support a finding that Devicor's reasons for firing plaintiff was a pretext or that plaintiff's age or sex played any part in the decision. Although this fact is not dispositive, it is noteworthy that of the four people involved in the decision to terminate plaintiff, both Baia and Bryan fall within the ADEA's protected age range. Turchick Decl., [Dkt. 36-2] (Parisi and Garlock's ages do not appear to be in the record). Plaintiff further admits that during her employment at Devicor, she did not believe that she was being discriminated against, and she specifically denies that Downs, Parisi, or Jim Frontero (the man who hired her and supervised her during her first few months) discriminated against her. Kuhar Dep., [Dkt. 36-1] at 266:11-21, 270:1-9. Most importantly, at the time of her deposition, plaintiff could not remember any derogatory comments that Baia made about her age or gender. Kuhar Dep., [Dkt. 36-1] at 267:6-8. The one comment that could possibly be construed as

discriminatory—that Plaintiff was "ditzy"[8]— is not sufficient to permit a reasonable jury to conclude that the decision to fire plaintiff was pretext. Therefore, her claim rests solely upon the termination decision itself and any inference that her age or sex were factors in Devicor's decision to end her employment is not "within the range of reasonable probability" and would "amount to speculation or conjecture." Thompson, 57 F.3d at 1323. For these reasons and those stated in open court, summary judgment has been granted to Devicor on plaintiff's age and sex discrimination claims.

2. Count III: Defamation

Plaintiff's complaint identifies three defamatory statements. First, that Baia told WRA employees that plaintiff left Devicor voluntarily, without giving notice;[9] second, that the reason Baia provided for this departure was that plaintiff's niece was "depressed" and "off her meds;" and, third, that plaintiff was "not a closer." [Dkt. 1] ¶¶ 62-63. In plaintiff's brief in opposition to summary judgment, she conceded that the statement regarding her niece's mental health was not defamatory. Pl. Opp. at 21 n.5. As to the two remaining statements, defendants contend that the comment that plaintiff "up and left" is an accurate statement of fact and that the statement that plaintiff "was not a closer" is either an opinion or a true statement of fact.

---

[8] Plaintiff contends that during her termination dinner Baia told her that sometimes she looked ditzy. Kuhar Dep., [Dkt. 36-1] at 222:4-18. According to Baia, one of Devicor's marketing liaisons told him that a physician at George Washington University Hospital has commented that plaintiff was ditzy but Baia chose not to relay that comment to her at the time he heard it because it would have been insensitive. Baia Dep., [Dkt. 40-5] at 136:1-21.

[9] This statement has been characterized in a variety of similar ways over the course of the litigation. In her Complaint, plaintiff alleges that Baia said she "had 'up and left' her job without giving notice." [Dkt. 1] ¶ 35. One of the WRA employees stated during her deposition that Baia said "[plaintiff] just up and left me high and dry." Jacques Dep., [Dkt. 40-7] at 23:19-20; see also Kuhar Dep., [Dkt. 36-1] Ex. 8 (explaining, in an email from Jacques to Downs dated weeks after the incident, that Baia said plaintiff "'just up and left' the company").

In Virginia, the elements of defamation are (1) publication of (2) an actionable statement with (3) the requisite intent. Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015); Daniczek v. Spencer, 156 F. Supp. 3d 739, 752 (E.D. Va. 2016). Publication occurs when an oral statement is overheard by a third party. Snyder v. Fatherly, 163 S.E.2d 358, 363-64 (Va. 1932); Andrews v. Virginia Union Univ., No. 3:07-CV-447, 2008 WL 2096964, at *10 (E.D. Va. May 16, 2008). Neither party disputes that Baia's statements to the WRA employees, Jacques and McFarlin, were published.

With respect to the second element, to be "actionable," the statement must "not only be false, but defamatory, that is, it must tend so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Skillstorm, Inc. v. Elec. Data Sys., LLC, 666 F. Supp. 2d 610, 619 (E.D. Va. 2009). A statement is per se defamatory if, "among other things, it imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of duties, or prejudices the party in its profession or trade." Id. To prejudice a plaintiff in its profession or trade, "the statements must relate to the skills or character required to carry out the particular occupation of the plaintiff." JTH Tax, Inc. v. Grabert, 8 F. Supp. 3d 731, 740 (E.D. Va. 2014). To the extent that one or both of the alleged statements are defamation per se, they would be actionable even if plaintiff has not experienced a financial loss. Tronfeld v. Nationwide Mut. Ins. Co., 636 S.E.2d 447, 450 (Va. 2006).

As to the third element, intent, for private individuals the requisite intent is present if "defendant knew that the statement was false or, believing that the statement was true, lacked a reasonable basis for such belief, or acted negligently in failing to determine the facts on which the publication was based." Hyland v. Raytheon Tech. Servs. Co., 670 S.E.2d 746, 750 (Va. 2009).

Baia's comment that plaintiff "up and left" is a statement of fact. See Fuste v. Riverside Healthcare Ass'n, Inc., 575 S.E.2d 858, 862 (Va. 2003) (holding that statements that doctors "left suddenly" and "abandoned" their patients were capable of being proven true or false). Plaintiff argues that this statement pertains to her qualifications for the sales profession and is defamation per se; however, plaintiff cites no authority for this proposition, instead relying on cases that deal with defamatory statements regarding moral character and professional competency. Pl. Opp. at 21. The only relevant case, which was identified by the Court, Fuste, casts doubt on plaintiff's argument. There, the court concluded that statements that two doctors abandoned their patients by leaving their practice suddenly were defamation per se. 575 S.E.2d at 862. But, in reaching this conclusion, the court emphasized that doctors have a professional duty to continue services to a patient after accepting employment and cannot thereafter voluntarily abandon their patient. Id. Here, by contrast, plaintiff was a sales representative, not a doctor. And, plaintiff offers no evidence that the sales profession has any norms against immediate resignation. Quite to the contrary, plaintiff was an at-will employee and it is a fundamental principle of at-will employment that both the employer and the employee reserve the right to terminate employment without warning. See Kuhar Offer of Employment, [Dkt. 36-1] Ex. 3 ("Devicor Medical is an at-will employer. Your relationship with the Company will therefore be at-will, which means you or the company may terminate your employment at any time, with or without cause or notice."). Further, irrespective of whether plaintiff can prove monetary damages, there is no evidence that Baia's statements actually "prejudiced the [plaintiff] in [her] profession or trade." Skillstorm, Inc., 666 F. Supp. at 619. In fact, the undisputed evidence shows that the statement caused no damage. Jacques and McFarlin, the two WRA associates to whom the statements were made, and Waring, WRA's CFO, all stated that they

continue to think very highly of the plaintiff. Jacques Dep., [Dkt. 36-9] at 13:8-20; McFarlin

Dep., [Dkt. 36-10] at 12:7-15; Kuhar Dep., [Dkt. 36-1] at 277:11-22. Plaintiff herself has

acknowledged this fact, admitting in her deposition that she "[doesn't] think [Baia's] statements

lowered the perception" of her. Kuhar Dep., [Dkt. 36-1] at 112:12-22. Instead, she stated that she

hoped that the WRA employees did not take offense that she "did not come in and tell them"

herself. Id. On these facts, the statement that plaintiff "up and left" does not qualify as

defamation per se.

Further, even if this statement is actionable, plaintiff fails to identify any facts

establishing that the statement was false. As an initial matter, there are two possible ways to

interpret the statement that plaintiff "up and left." According to defendants, it means that plaintiff

abandoned the transition plan she agreed to with Baia by leaving before the agreed February 13,

2015 date. Def. Memo. at 28-29. In contrast, plaintiff argues that the statement suggested that she

voluntarily resigned. Pl. Opp. at 21-22. The ambiguity inherent in the statement weakens

plaintiff's argument for defamation, as the more vague a statement or the more meanings it can

possibly convey, the less likely it is to be actionable. Biospherics, Inc. v. Forbes, Inc., 151 F.3d

180, 185 (4th Cir. 1998) (citing Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 129 (1st

Cir. 1997)).

Further, under either interpretation of Baia's comment, it was true or substantially true.

The undisputed facts establish that, upon being notified of her termination, plaintiff agreed to

work an additional month and perform a series of transition tasks. Def. Uncontested Facts ¶ 53.

Plaintiff admits that after making that agreement she chose not to complete the transition process

and her employment ended before the agreed upon date. Kuhar Dep., [Dkt. 36-1] at 231:15-

32:10, 234:22-35:6. She also acknowledges that she neglected to inform her customers that she

was leaving Devicor. Kuhar Dep., [Dkt. 40-2] at 101:8-02:13. On these facts, the statement that

she "up and left" appears true. In addition, even if the statement were not literally true, plaintiff

has provided no evidence of intent, i.e., that Baia knew that the statement was false or had a

reasonable basis for believing that it was true. Hyland, 670 S.E.2d at 750.[10] Although plaintiff

claims that she communicated her intention to terminate the transition to Bryan, there is no

evidence that this was communicated to Baia. Kuhar Dep., [Dkt. 36-1] at 234:19-21 (admitting

that plaintiff never told Baia that she would no longer work with him). In fact, Baia's multiple

attempts to contact plaintiff, all of which went unanswered, suggest that he was not informed and

that, as of the February 2015 meeting with WRA, Baia believed that she "up and left" Devicor.

Kuhar Dep., [Dkt. 36-1] at 235:9-14; Text Message Log Between Baia and Kuhar, [Dkt. 36-7] at

DEF 00815.

    To the extent that Baia's comments suggested that plaintiff resigned voluntarily, Pl. Opp.

at 22, in the context in which Baia made the statement, this was substantially true. A statement

"is not considered false . . . unless it would have a different effect on the mind of the reader from

that which the pleaded truth would have produced." Masson v. New Yorker Magazine, Inc., 501

U.S. 496, 517 (1991). Under Virginia law, "A plaintiff may not rely on minor or irrelevant

inaccuracies to state a claim for [defamation]." Jordan v. Kollman, 612 S.E.2d 203, 207 (Va.

2005). To the contrary, "[s]light inaccuracies of expression are immaterial." Id. (citing Saleeby v.

Free Press, Inc., 91 S.E.2d 405, 407 (Va. 1956)). As numerous courts have acknowledged, "A

statement is substantially true, and thus not actionable, if its 'gist' or 'sting' is not substantially

---

[10] The one statement that might possibly indicate knowledge of falsity—Baia's interrogatory
response stating he told Jacques that "[plaintiff] has resigned from her employment with Devicor
because [he] did not think [plaintiff] would appreciate [him] telling people her employment had
been terminated for poor performance," see Baia Int., [Dkt. 40-10] at 9—is not to the contrary
because, as explained below, the statement that she resigned was substantially true.

worse than the literal truth. This evaluation requires [courts] to determine whether, in the mind of the average person who read the statement, the allegedly defamatory statement was more damaging to the plaintiff's reputation than a truthful statement would have been." Cummins v. Suntrust Capital Markets, Inc., 649 F. Supp. 2d 224, 244 (S.D.N.Y. 2009), aff'd, 416 F. App'x 101 (2d Cir. 2011) (citing Gustafson v. City of Austin, 110 S.W.3d 652, 656 (Tex. Ct. App. 2003)); see also Fleckenstein v. Friedman, 193 N.E. 537, 538 (N.Y. 1934) (same). Even if the facts supported plaintiff's arguments that 1) Baia's comments suggested that she voluntarily resigned and 2) that premature termination of the transition period was not equivalent to voluntary resignation, the truth—that plaintiff had been terminated for failing to meet her sales quotas—was worse. As an at-will employee, plaintiff's voluntary resignation from Devicor should not have reflected unfavorably upon her professional qualifications. By contrast, the literal truth, that she was terminated for failing to achieve her annual quotas, would be much more damaging to an employee's reputation as a medical device salesperson. Although plaintiff challenges defendants' claim that Baia's comment was intended to spare the plaintiff the embarrassment of disclosing that she had been terminated, see Baia Int., [Dkt. 40-10] at 9, the effect of his statement was no worse than the truth, and therefore was not damaging to plaintiff's professional reputation.

With respect to the statement that plaintiff was "not a closer," this defamation claim fails for either of two reasons. First, as a description of plaintiff's work performance it qualifies as a statement of opinion. Under Virginia law, "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action. Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion."

Jordan, 612 S.E.2d at 206. Statements about employee work performance have consistently been deemed matters of opinion. See, e.g., Am. Commc'ns Network, Inc., v. Williams, 568 S.E.2d 683, 686 (Va. 2002) (holding that a corporation's determination that a management team had failed to establish "effective operations" was a statement of opinion); Raytheon Tech. Servs. Co. v. Hyland, 641 S.E.2d 84, 92 (Va. 2007) (holding that the conclusion in an employment performance review that an employee was verbose and opinionated to the point of not participating in open dialogue was a statement of opinion). Baia's statement that plaintiff was not a closer reflected his subjective assessment of her performance. That plaintiff disagrees with this assessment reinforces its subjective nature.

Second, if the statement that plaintiff was "not a closer" were considered a factual statement, it would be demonstrably true. Jordan, 612 S.E.2d at 206 (explaining that even if statements were actionable and intentional, "truth remains an absolute defense"). According to the undisputed facts, plaintiff failed to meet her sales quota in 2012, 2013, and 2014 and she had the lowest sales quota achievement of any of Baia's team in 2014, Kuhar Dep., [Dkt. 36-1] at 212:13-17. Her annual performance evaluations and Field Visit Letters consistently emphasized that she needed to increase sales and close more accounts. Kuhar Dep., [Dkt. 36-1] Exs. 8-9, 11-13. She also admitted that she did not close all the accounts identified in her 2014 Performance Improvement Plan. Def. Uncontested Facts ¶ 49. Although she initially saved the WRA account, she did so by offering them a $180,000 discount, and she was unable to close an account on the Revolve product line in 2014, id. ¶ 37. Thus, to the extent that plaintiff contends that Baia's "closer" statement is a matter of fact, the evidence shows that she was, in fact, "not a closer." Because that statement would be a truthful statement of fact, it cannot be considered defamatory.

## CONCLUSION

For the reasons discussed in open court and more fully set forth in this memorandum

opinion, summary judgment has been granted for the defendants on all claims in the plaintiff's

Complaint.

_____ /s/ _____
Leonie M. Brinkema
United States District Judge

10/24/16

27